IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRANKLIN T.,[1]

                Plaintiff,

        v.

ANDREW M. SAUL, Commissioner of Social
Security,

                Defendant.

Case No. 3:19-cv-00967-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       Franklin T. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of his applications for child's insurance

benefits and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), and both parties have consented to the jurisdiction of a U.S. Magistrate Judge

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member or care giver.

pursuant to 28 U.S.C. § 636. For the reasons explained below, the Court reverses the Commissioner's decision and remands for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either a grant or a denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## BACKGROUND

## I.    PLAINTIFF'S APPLICATIONS

Plaintiff was born in March 1995 and was twenty years old on March 9, 2016, the day he filed his SSI application, and twenty-one years old on April 1, 2016, the day he filed his application for child's insurance benefits. (Tr. 14, 225-37.) Plaintiff obtained his GED and has no past work experience. (Tr. 26, 1276.) In his applications, Plaintiff alleges disability due to

attention deficit/hyperactivity disorder (ADHD), fetal alcohol effects, and problems with impulse control. (Tr. 86, 98-99, 115, 130.)

The Commissioner denied Plaintiff's applications initially and upon reconsideration, and on January 9, 2017, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 86-143, 166-68.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on May 3, 2018. (Tr. 35-84.) On July 3, 2018, the ALJ issued a written decision denying Plaintiff's applications. (Tr. 11-34.) Plaintiff now seeks judicial review.

## II.    THE SEQUENTIAL ANALYSIS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the sequential analysis, where the Commissioner must show the claimant can perform other work that exists in significant

numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

III.    **THE ALJ'S DECISION**

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 11-34.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2016, the alleged onset date. (Tr. 16.) Plaintiff had worked after the application date, but the ALJ found this work activity "did not rise to the level of substantial gainful activity." (Tr. 16.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "Attention Deficit/Hyperactivity Disorder (ADHD) and Depression." (Tr. 16.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or equals a listed impairment. (Tr. 17.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels," subject to these nonexertional limitations: (1) "is able to carry out two to three step tasks independently without special supervision," (2) "has limited ability to concentrate, but can do so for two hour periods in routine settings," (3) "has some difficulty working in close coordination with others, but is able to work independently," (4) can "sustain a normal workday/workweek for simple and routine tasks," (5) "is able to have occasional direct public and close coworker contact," and (6) "cannot perform assembly line work." (Tr. 18-19.) At step four, the ALJ concluded that Plaintiff has no past relevant work experience. (Tr. 26.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a floor cleaner, landscape worker, and pressure washer. (Tr. 27.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by failing to: (1) provide specific, clear, and convincing reasons for discounting his testimony; (2) provide legally sufficient reasons for discounting the medical opinions of Plaintiff's examining physicians, Drs. Bruce Boyd and Nancy Bryant, and treating mental health provider, April Duyn; (3) provide germane reasons for rejecting the lay witness testimony provided by Plaintiff's adoptive mother, Susan F., and Plaintiff's adult foster care home manager, Yonathan Y.; (4) conclude that Plaintiff's neurodevelopmental disorder associated with prenatal alcohol/drug exposure constituted a severe impairment at step two; (5) conclude that Plaintiff was presumptively disabled under listings 12.04, 12.06, 12.11, and 12.15 at step three; and (6) pose a hypothetical to the VE that contained all of Plaintiff's credible limitations.

As explained below, the Commissioner's decision is based on harmful legal error and not supported by substantial evidence, and therefore the Court reverses the Commissioner's decision.

## I.    PLAINTIFF'S SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons

for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

The Ninth Circuit has held that clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between [his] testimony and [his] conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which could reasonably produce some of the symptoms alleged. (*See* Tr. 19, reflecting that the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.") The ALJ was therefore required to provide clear and convincing reasons for discrediting Plaintiff's symptom testimony. The ALJ failed to meet that standard here.

### 1.    Effective Treatment

The ALJ discounted Plaintiff's testimony on the ground that the medical record "appears to show improvement in the [Plaintiff's] condition with appropriate treatment." (Tr. 22.) An ALJ may discount a claimant's testimony based on effective treatment. *See Bettis v. Colvin*, 649 F. App'x 390, 391 (9th Cir. 2016) (holding that the ALJ met the clear and convincing reasons standard, and stating that the ALJ appropriately discounted the claimant's testimony on the

ground that his "condition improved with treatment," because "'[i]mpairments that can be
controlled effectively with [treatment] are not disabling'") (citation omitted). Here, however,
substantial evidence does not support the ALJ's finding.

The Court acknowledges that Plaintiff "showed improvement" while on medication in
January 2016, February 2016, July 2016, and January 2018, as the ALJ noted. (*See* Tr. 22-23,
finding that Plaintiff showed improvement with appropriate treatment and citing to the following
medical opinions: (1) Tr. 927, a January 22, 2016 medical record describing Plaintiff's mood as
stable and his anxiety as manageable; (2) Tr. 923, a February 3, 2016 medical record where
Plaintiff reported he was "doing good" and "staying on my medication"; (3) Tr. 920, a July 12,
2016 medical record where Plaintiff noted his medications are "doing good" and when asked
whether he was experiencing medication side effects he said "no, not really"; and (4) Tr. 1023, a
January 23, 2018 medical note where Plaintiff stated he is "feeling better" now that he is back on
medication.)

However, even while on medication, Plaintiff continued to report depression, impulsivity,
and anxiety:

- In a July 25, 2016 treatment note, Plaintiff explains that his current medications
  are "working for him," but he still experiences depression and complains of
  anxiety (Tr. 759);

- In an August 2, 2016 medical report, Plaintiff describes medications are "doing
  good" yet states that meetings "increases [his] anxiety" and "at times I feel like I
  want to run" (Tr. 917);

- In a January 24, 2017 counseling note, Plaintiff reports an "increase in depressive
  symptoms due to his work schedule" (Tr. 1077);

- In a July 7, 2017 progress note, Plaintiff reports a "reduction in depressive
  symptoms" and that his ADHD symptoms "feel manageable," but also reports that
  "he has been experiencing depression, behavior challenges, ADHD symptoms,
  anxiety, and relational problems with his parents who adopted him when he was
  15 months old" (Tr. 1065);

- A September 14, 2017 progress report notes that Plaintiff's medications work well, but wear off if he is working double shifts (Tr. 1056);

- In a January 9, 2018 progress note, Plaintiff describes being "aggressive at times," that he experiences anxiety when he "[g]ets rushed," and "freaks out," and that his "[b]oss has been working with him" to address these issues (Tr. 1039);

- In a second January 9, 2018 progress note, Plaintiff notes that he went off medication for a week, but has restarted medication, yet notices "mood swings are more prominent" and that he still has "[s]ome difficulty with impulsiveness" (Tr. 1034-35); and

- In a January 16, 2018 counseling note. Plaintiff reports continuing to experience angry outbursts (Tr. 1030).

In fact, Plaintiff noted continued impulsiveness in the same progress note that the ALJ cites as showing Plaintiff was "feeling better on medication." (*Compare* Tr. 23, citing Exhibit 23F/10, a January 23, 2018 progress note indicating that Plaintiff was "getting back on medication and feeling better" *with* Tr. 1023, the same January 23, 2018 progress note in which Plaintiff also notes that he still experiences impulsiveness "when stressful times come up.") Thus, substantial evidence in the record does not support the ALJ's finding that Plaintiff's impairments were effectively treated and, therefore, this was not a clear and convincing reason to reject Plaintiff's subjective symptom testimony.

## 2.    Daily Activities

The ALJ also discounted Plaintiff's testimony regarding his alleged impairments based on his daily activities, noting that Plaintiff: (1) is "able to care for his personal hygiene independently," (2) "prepares meals, and perform[s] household chores," including "laundry, cleaning, and yardwork," (3) "is able to utilize public transportation and shop for groceries," and (4) "indicated that his hobbies included music, hiking, snowboarding, and walking." (Tr. 23.)

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim*, 763 F.3d at 1165. Although the ALJ

correctly notes that Plaintiff performs these activities of daily living, these types of activities do not contradict Plaintiff's testimony. Plaintiff never claimed that he is completely unable to function, but that his symptoms cause him to experience stress, anxiety, and impulsivity that makes it difficult for him to complete tasks or to maintain employment. (*Compare* Tr. 56, where Plaintiff testified during the May 3, 2018 ALJ hearing that he cooks, shops, and occasionally performs household chores like laundry *with* Tr. 43-45, Plaintiff lost jobs because of stress, anxiety, and anger issues; Tr. 71, Plaintiff had angry outbursts two to three times a week due to "[p]eople raising their voices at me"; Tr. 72, Plaintiff experienced confusion when riding the bus to a location he visits two to three times a week; Tr. 73, Plaintiff forgot to complete simple tasks like laundry; Tr. 76, Plaintiff's anxiety causes him to "overreact" or to "give up" on completing tasks.)

The medical evidence and third party statements corroborate Plaintiff's testimony that he struggles with staying focused on tasks, needs reminders to complete tasks and take medication, struggles with impulse control, and experiences heightened anxiety during stressful situations, which caused him to attempt suicide in February 2016 after getting into an argument with his adoptive mother and to lose jobs because of angry outbursts and trouble managing stress:

- In an October 7, 2008, Psychological Evaluation Report, Dr. Bryant found that Plaintiff showed "[i]nconsistency of performance" relating to several areas of testing relating to attention (Tr. 478);

- In a January 22, 2016 medical note, Plaintiff describes "flipp[ing] out" and leaving stressful situations (Tr. 926);

- In a February 15, 2016 treatment note, Plaintiff presented for evaluation of a suicide attempt after "getting into a verbal altercation with his mother" (Tr. 1180);

- In a February 20, 2016 treatment note, Plaintiff describes difficulty controlling his temper, and explains that he was fired from a job because

of an angry outburst with a coworker, and lost another job because he ran away from it (Tr. 1238);

• In an April 28, 2016 Third-Party Adult Function Report, Plaintiff's adoptive mother, Susan F., reported that Plaintiff is "easily frustrated and agitated" and has an "inability to think thr[ough] simple tasks due to his learning disabilities due to fetal alcohol effect" (Tr. 266);

• In a May 17, 2016 counseling note, Plaintiff reports moving into foster care in March 2016 after getting into an argument with his adoptive mother, and noted past aggression and attempts to harm himself (Tr. 1114);

• A June 20, 2016 Neuropsychological Screening Report indicates that Plaintiff "likely would have difficulties with persistence and his attention after 1 to 2 hours" (Tr. 735);

• A July 12, 2016 medical note states that Plaintiff was "having some difficulty with focus" and was being "triggered" by his adoptive father (Tr. 921);

• A January 9, 2018 treatment note reports that Plaintiff experiences anxiety when rushed and "freaks out" (Tr. 1039);

• In a January 23, 2018 treatment note, Plaintiff describes "zoning out" even when taking medication and experiencing impulsiveness during stressful situations (Tr. 1023);

• In a March 15, 2018 letter from Plaintiff's adult foster home manager, Yonathan Y. reports that Plaintiff has problems "remembering things" on a daily basis, has difficulties "thinking straight and focus[ing] on one thing," and staff manages his medication administration (Tr. 304); and

• Plaintiff testified at the ALJ hearing that he lost jobs due to stress and anxiety relating to the fast pace and due to having anger issues with co-workers (Tr. 43-44).

The ALJ failed to explain how Plaintiff's activities of daily living undermine his testimony regarding his limitations relating to his anxiety, impulsiveness, angry outbursts, and problems with memory that are associated with his impairments. *See Fritz v. Berryhill*, 685 F. App'x 585, 586 (9th Cir. 2017) (holding that the ALJ failed to meet the clear and convincing reasons standard and noting that the ALJ "did not explain how" certain evidence "impacted [the

claimant's] credibility"). Accordingly, the ALJ erred in discounting Plaintiff's testimony based on his daily activities.

### 3. Objective Medical Evidence

The ALJ also discounted Plaintiff's testimony on the ground that it was inconsistent with the objective medical evidence. (*See* Tr. 19-22; summarizing the objective medical evidence, and concluding that the medical record "appears to suggest a level of functioning greater than one alleged by the [Plaintiff]"; *see also* Def.'s Br. at 9-10 agreeing with the ALJ's determination that Plaintiff's "allegations were out of proportion with the medical findings.")

As discussed above, the ALJ erred in discounting Plaintiff's testimony based on effective treatment and his daily activities. Even if Plaintiff's testimony is not supported by the objective medical evidence, the ALJ cannot properly rely on that as the sole reason to discredit Plaintiff's testimony. *See Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony about debilitating mental and physical impairments) (citation omitted). Accordingly, the Court concludes that the ALJ erred in discounting Plaintiff's testimony. *See Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) ("Because the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony.") (citing *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005)).

## II. MEDICAL OPINION EVIDENCE

### A. Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc.*

*Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* (quoting *Reddick*, 157 F.3d at 725). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Dr. Bruce Boyd, Ph.D.

Plaintiff argues that the ALJ failed to provide a legally sufficient reason for rejecting the opinion of his examining doctor, Dr. Bruce Boyd. (Pl.'s Opening Br. at 8.) The Court agrees.

Dr. Boyd examined Plaintiff on August 6, 2014 to determine Plaintiff's eligibility for Developmental Disabilities ("DD") services, and drafted an Evaluation Report on September 2, 2014. (Tr. 722-27.) Upon examination, Dr. Boyd noted that Plaintiff exhibited some physical signs of Fetal Alcohol Syndrome, including a smooth philtrum and a small lower jaw. (Tr. 724.) Dr. Boyd also noted that Plaintiff exhibited 18 of 30 behavioral characteristics associated with

Fetal Alcohol Syndrome, including "immaturity, one-sided interactions, superficial friendships, irresponsibility, executive dysfunction (difficulty setting task goals, self-monitoring of task performance, difficulty completing tasks), ADHD signs (e.g., inattention, impulsivity, distractibility), disorganization, getting lost, difficulty transitioning, concrete thinking, poor judgment, difficulty learning from consequences and predicting consequences, need for extra teaching, and mood swings." (Tr. 724-25.)

Dr. Boyd reported that Plaintiff was able to follow one-part, but not two-part instructions, and that he was unable to follow instructions after a brief delay. (Tr. 725.) Dr. Boyd noted that Plaintiff could perform basic self-care skills like bathing or dressing but relied on others for health care. (Tr. 725.) Plaintiff's father reported to Dr. Boyd that Plaintiff uses the bus system but gets lost. (Tr. 726.) Dr. Boyd noted that Plaintiff becomes angry when changes are made to his daily routine, and "does not control his anger or hurt feelings when denied his way or if given constructive criticism." (Tr. 726.)

Dr. Boyd concluded that Plaintiff has a neurodevelopmental disorder associated with prenatal drug/alcohol exposure, attention deficit/hyperactivity disorder, and major depressive disorder that was in remission with treatment. (Tr. 726.) Based on these impairments, Dr. Boyd found that Plaintiff functions in the moderate to mild range of impairment. (Tr. 726.) Dr. Boyd noted that Plaintiff's fetal alcohol/drug effects have existed since birth and "its effect on adaptive deficit is considerable." (Tr. 726.) Dr. Boyd believed Plaintiff's fetal alcohol disorder placed him in a position that "is one standard deviation below the cutoff for significance for DD eligibility." (Tr. 726.) Overall, Dr. Boyd concluded that Plaintiff would "indefinitely need supports similar to a person with intellectual disability" and recommended "ongoing medication management and therapy." (Tr. 726.)

PAGE 13 – OPINION AND ORDER

On October 12, 2016, Dr. Boyd examined Plaintiff a second time. (Tr. 737-41.) Dr. Boyd's findings were consistent with those from his September 2, 2014 evaluation, again noting that Plaintiff exhibited signs such as "over reacting to things, poor manners, disorganization, losing things, poor judgment, immaturity, irresponsibility, executive dysfunction (e.g., goal-setting, task planning, monitoring, and completion), ADHD signs (e.g., impulsivity, distractibility, inattention, not completing tasks), difficulty with time concepts, difficulty with money management, need for extra teaching, not learning from experience, and variable performance." (Tr. 739.) Again, Dr. Boyd found Plaintiff had a moderate to mild range of adaptive impairment, noting the Plaintiff does few household chores, needs reminders to bathe, and "retreats or is passive in unfamiliar situations." (Tr. 740.) Dr. Boyd found that Plaintiff's fetal alcohol spectrum disorder was the "greatest contributor to [Plaintiff's] adaptive deficit and that his condition remained "one standard deviation below the cutoff for significance." (Tr. 740.) Dr. Boyd concluded that Plaintiff will "indefinitely need supports similar to a person with intellectual disability." (Tr. 740.)

The ALJ gave Dr. Boyd's medical opinion "limited weight," finding that his medical opinions were "only partially supported by the medical record." (Tr. 24.) Specifically, the ALJ found the medical record supported Dr. Boyd's assessment that Plaintiff would "be limited to mild to moderate range of impairment," noting that recent medical examinations showed Plaintiff had "appropriate appearance/dress; appropriate hygiene; cooperative attitude; good eye contact; normal gait; normal speech; euthymic mood; normal affect; appropriate thought content; coherent thought process; normal memory; and fair insight and judgment." (Tr. 24, citing Exs. 17F/2; 22F/1-2 and 4-5; and 27F/7 and 87.) However, the ALJ discredited Dr. Boyd's opinion regarding Plaintiff's fetal alcohol syndrome, finding that Dr. Boyd "appears to overestimate the

effect of the claimant's fetal alcohol syndrome disorder." (Tr. 24.) In making this finding, the ALJ noted that Plaintiff obtained his GED, and found that this "is a strong indicator that he could function at a relatively high level for an individual with fetal ETOH syndrome." (Tr. 24.)

Dr. Boyd's medical opinion conflicts with the opinion of the examining doctor, Dr. Daniel Sharf, who found Plaintiff was "able to understand and remember instructions" and could "sustain concentration and attention" (although he noted that Plaintiff would "have difficulties with persistence and his attention after 1 to 2 hours"). (*See* Tr. 735.) Therefore, the ALJ was required to provide specific and legitimate reasons for discrediting Dr. Boyd's medical opinion. The ALJ failed to do so here.

The ALJ did not explain why Plaintiff's ability to obtain his GED contradicts the limitations noted by Dr. Boyd. In fact, the record reflects that Plaintiff struggled to receive his GED and was only able to pass the test with accommodations including additional time to complete the test. (*See* Tr. 199, a June 11, 2013 counseling note noting that Plaintiff passed every GED test with average scores, but was unable to pass the math GED; Tr. 1276, a December 12, 2013 counseling note explaining that Plaintiff was able to pass the math GED but "he had accommodations this time around" including the ability "to use a calculator as well as have extended time.") That Plaintiff required accommodations to obtain his GED supports Dr. Boyd's findings regarding Plaintiff's distractibility and inattention. Additionally, Plaintiff's ability to pass the GED does not contradict Dr. Boyd's findings regarding Plaintiff's inability to handle stressful situations and act appropriately with others without acting impulsively or having an angry outburst related to stress. As noted above, Plaintiff lost a job because of an angry outburst, and Plaintiff's medical records reflect a history of angry outbursts and overreactions to situations, including a 2012 event where he grabbed his adoptive mother and threw her on a bed

when he became angry and a 2016 suicide attempt following an argument with his adoptive

mother. (*See* Tr. 1114, 1325.) Finally, the record contains evidence that Plaintiff requires daily

assistance, including living in an adult foster home where others prepare his meals and manage

his medication, which further supports Dr. Boyd's findings that Plaintiff will indefinitely "need

supports similar to a person with intellectual disability." (*See* Tr. 304.) Therefore, Plaintiff's

ability to pass the GED is not a specific and legitimate reason supported by substantial evidence

to discredit Dr. Boyd's medical opinion.

### C.    Dr. Nancy Bryant, Ph.D.

Plaintiff also argues that the ALJ improperly rejected Dr. Nancy Bryant's medical

opinion. (Pl.'s Opening Br. 10-11.)

Dr. Bryant performed a psychological examination of Plaintiff in September 2008, and

documented her findings in a report dated October 7, 2008. (Tr. 467-82.) During her evaluation,

Dr. Bryant found that Plaintiff's mood was irritable with occasional angry outbursts and that he

had a mildly constricted affect. (Tr. 470.) She noted that his judgment was difficult to assess, and

that "impulsivity may sometimes interfere with exercise of his reasoning capacities." (Tr. 470.)

She noted that Plaintiff was cooperative during the examination and "was on task and apparently

giving his best effort throughout." (Tr. 470.) Dr. Bryant found that there was "no reason to doubt

the validity or reliability of [the examination] results." (Tr. 470.)

Dr. Bryant found that Plaintiff's full-scale IQ was below average, but that "his

impulsivity may have interfered with his performance on some tests." (Tr. 471.) Overall, Dr.

Bryant concluded that Plaintiff "earned solidly average scores on tests of verbal reasoning,

general knowledge, word list learning, memory for stories, memory for sentences, letter-based

verbal fluency, word identification and decoding, memory for abstract figures, memory for

visual sequences, and with medication support, on tests of sustained and selective attention." (Tr.

478.) However, she also noted that Plaintiff had challenges with "[i]nconsistency of performance," noting that he performed "quite adequately on some tests, but poorly on others measuring similar skills and abilities." (Tr. 478.) Dr. Bryant found that it was unclear if the inconsistency "has to do with random concentration issues, task-specific difficulties, uneven effort, or unsuspected processing difficulties." (Tr. 478.) Dr. Bryant also noted "deficits in basic academic skills," noting challenges in Plaintiff's math skills in particular, and "at least sporadic difficulties with attention despite his return to using medication for ADHD." (Tr. 479.) Additionally, Dr. Bryant found "unexpected difficulties on some measures of visual and visuospatial processing," noting "weak memory test performances" and "difficulty on one test of visuospatial construction" which "suggest an inefficiency of visual processing that may sometimes interfere with [Plaintiff's] functioning." (Tr. 479.) Dr. Bryant noted trouble in Plaintiff's executive functioning which would translate to Plaintiff "likely to have a very high need for adult structure and support to maintain attention and effort of learning tasks" and that Plaintiff "may have notable difficulty coping in effective ways when he is emotionally distressed, as he finds it hard to problem solve and has trouble regulating his feelings, and he may thus be unusually prone to act on impulse under conditions of significant stress." (Tr. 480.) Dr. Bryant recommended that Plaintiff "most certainly continue in therapy" and noted that "he faces some cognitive changes that undermine his ability to cope." (Tr. 480.) Dr. Bryant noted that Plaintiff "is at risk of decompensation under stress, due to his difficult early history and his mild cognitive limitations, and does need help with developing his repertoire of coping strategies." (Tr. 481.) Dr. Bryant also noted that Plaintiff "may be unusually vulnerable to exploitation." (Tr. 481.)

The ALJ gave Dr. Bryant's medical opinion "little weight," for the following reasons: (1) Dr. Bryant's report was written "outside of the period of consideration and significantly dated," and (2) Dr. Bryant's report is inconsistent with Plaintiff's ability to obtain his GED, which the ALJ found is "a strong indicator that the claimant could function at a relatively high level for an individual with fetal ETOH syndrome" and was "indicative of the ability to perform at the level of the above residual functional capacity." (Tr. 24-25.)

Like Dr. Boyd, Dr. Bryant's medical opinion conflicts with the opinion of examining doctor, Dr. Daniel Sharf. (*See* Tr. 735.) Therefore, the ALJ was required to provide specific and legitimate reasons for discrediting Dr. Bryant's medical opinion. The ALJ failed to do so here.

As an initial matter, Plaintiff does not dispute the ALJ's finding that Dr. Bryant's opinion is dated and outside the relevant time period. (Pl.'s Opening Br. 11.) However, Plaintiff argues that Dr. Bryant's opinion "is highly probative and cannot be rejected without legally sufficient reasons," which Plaintiff argues the ALJ has not provided. (Pl.'s Opening Br. 11.)

The Ninth Circuit has recognized that medical opinions that predate the alleged onset of disability are of limited relevance. *Carmickle v. Comm'r*, 533 F.3d 1155, 1165 (9th Cir. 2008). However, in a more recent unpublished decision, the Ninth Circuit held that the ALJ should consider all medical evidence, even if it predates the claimant's alleged onset date. *See Williams v. Astrue*, 493 F. App'x 866, 868-69 (9th Cir. 2012) (holding that the ALJ erred by ignoring medical opinions dated prior to the plaintiff's alleged onset date). Here, although Dr. Bryant's medical opinion is dated and outside the period of consideration, the ALJ was required to consider it and to provide legally sufficient reasons to reject it. Additionally, given the nature of Plaintiff's impairments, which medical and education records demonstrate existed from birth (*see* Tr. 317-31, showing the effects of opiate withdrawal on Plaintiff as an infant; Tr. 364-466,

483-602, 625-721, showing a history of Plaintiff's problems at school with respect to concentration and impulsivity), the fact that Dr. Bryant's opinion pre-dated the alleged onset date is not a legally sufficient reason to reject it. *See Henderson v. Comm'r, Soc. Sec. Admin.*, No. 6:17-CV-00481-HZ, 2018 WL 2102401, at *9 (D. Or. May 4, 2018) (holding that although the date of a medical opinion is a factor the ALJ can consider when deciding how much weight to assign such opinion, the fact that the opinion was made prior to the alleged onset date does not make it insignificant or not probative especially where the claimant suffers from an ongoing impairment).

The ALJ also discredited Dr. Bryant's medical opinion based on Plaintiff's ability to obtain his GED. (Tr. 24.) For the reasons discussed above with respect to Dr. Boyd, Plaintiff's ability to obtain his GED was not a specific and legitimate reason to discredit Dr. Bryant's medical opinion. Thus, the ALJ failed to provide any legally sufficient reasons supported by substantial evidence to discredit Dr. Bryant's medical opinion.

### D.    Unidentifiable Medical Opinion

On March 15, 2018, a medical provider, whose signature is illegible and whose name is not listed, completed a questionnaire regarding Plaintiff's abilities despite his mental impairments. (Tr. 1143-47.) The provider noted that he or she treated Plaintiff until October 2012, but the starting date of treatment is also illegible. (Tr. 1143.) In the questionnaire, the medical provider noted that Plaintiff suffers from poor memory, personality change, mood disturbance, substance dependence, feelings of guilt or worthlessness, difficulty thinking and concentrating, generalized persistent anxiety, hostility, and irritability. (Tr. 1143.) The provider noted that Plaintiff "cannot sustain employment" because of his difficulties interacting with others, and that he requires an environment with "minimal distraction/interaction to maintain focus." (Tr. 1144-45.) Additionally, the medical provider noted that Plaintiff "has lost more than

one job due to difficulties managing emotions." (Tr. 1145.) The provider concluded that Plaintiff would require unscheduled breaks to deal with emotional conflict, and that Plaintiff would miss three days of work per month and would be unable to manage benefits in his own interest. (Tr. 1146-47.)

The ALJ gave this medical opinion "no weight," because the "signature is unreadable" and "[a]s a result, it is difficult to assess the veracity of assessment." (Tr. 25.) Plaintiff argues that "the record clearly shows that April Duyn was the author of the opinion" based on the fact that "she noted her treating relationship with [Plaintiff]" and that the ALJ erred by failing to provide germane reasons for discrediting Duyn's opinion. (Pl.'s Opening Br. at 11-12.) The Commissioner responds that the ALJ reasonably gave the medical opinion "no weight" because the signature was illegible, and that any error is harmless because the ALJ elsewhere discredited medical opinions that Plaintiff "could not sustain employment due to the inability to interact with others and could not effectively adapt or manage himself." (Def. Br. at 8.) The Court agrees with Plaintiff.

As an initial matter, the ALJ erred by rejecting the medical opinion because the signature was illegible. The ALJ has a duty further to develop the record if "there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). The illegible signature created an ambiguity in the record, which the ALJ should have addressed. *See Giles v. Astrue*, No. EDCV 08-1088 JC, 2009 WL 2984049, at *7 (C.D. Cal. Sept. 17, 2009) (finding that a treating physician's illegible signature was not a legally sufficient reason to reject the opinion, and the fact that the ALJ could not read the signature created an ambiguity that the ALJ was required to address). Here, the ALJ

failed to address the ambiguity when he instead disregarded the opinion. (*See* Tr. 25.) Therefore, the ALJ erred by failing properly to evaluate this medical evidence.

The Commissioner argues that any error was harmless. (Def.'s Br. at 8.) Specifically, the Commissioner argues that the medical opinion concluded that Plaintiff "could not sustain employment due to the inability to interact with others" and that Plaintiff "could not effectively adapt or manage himself," but these findings were addressed by the ALJ elsewhere in his decision. (Def.'s Br. at 8.) The Court disagrees. As noted above, the ALJ failed properly to evaluate Plaintiff's symptom testimony and the medical opinions of Drs. Boyd and Bryant, and therefore it is unclear whether the ALJ properly accounted for Plaintiff's limitations relating to his ability to interact with others and to adapt and manage himself. Therefore, the Court cannot conclude that the error was harmless.[2]

### III.    LAY WITNESS TESTIMONY

Plaintiff argues that the ALJ failed to provide germane reasons for discounting the lay witness testimony provided by his adoptive mother, Susan F., and the manager of his adult foster home, Yonathan Y.[3] (Pl.'s Opening Br. at 14-17.)

#### A.    Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing reasons that are germane to each witness. *Stout v. Comm'r Soc. Sec. Admin.*,

---

[2] Although Plaintiff asks the Court to conclude that the ALJ failed to provide a germane reason to discredit Duyn's medical opinion (Pl.'s Opening Br. at 11-12), the Court cannot conclude that Duyn drafted the opinion because the illegible signature creates an ambiguity in the record that the ALJ, not the Court, must resolve.

[3] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the lay witnesses.

454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10-1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams*, 493 F. App'x at 869 (citation omitted).

### B.    Analysis

Susan F. completed a Third-Party Function Report on April 28, 2016. (Tr. 266-73.) She reported that Plaintiff is "easily frustrated and agitated," and has "an inability to think thr[ough] simple tasks due to his learning disabilities due to fetal alcohol effect." (Tr. 266.) Susan F. noted that Plaintiff has no problems in his ability to perform personal care activities, but does need verbal reminders to take care of personal needs and grooming. (Tr. 267-68.) Susan F. reported that Plaintiff prepares meals in his adult foster home, but his caregiver administers Plaintiff's medication. (Tr. 268.) Susan F. also noted that Plaintiff washes dishes, does laundry, and does yard work, but is easily distracted, requires verbal reminders, and must be checked on to make sure he completes tasks. (Tr. 268.)

Susan F. also provided an April 8, 2018 letter explaining Plaintiff's impairment history. (Tr. 310-12.) She reported that Plaintiff was exposed to drugs and alcohol in utero, and that as a child "his ADHD was off the charts." (Tr. 310.) Susan F. noted that Plaintiff experienced "tremendous difficulty in school" and required "specialized tutors in order to learn to read." (Tr. 310.) During high school, Plaintiff's "learning disabilities along with his anxiety disorder made

staying in school impossible," and "he kept running away from school because of his anxiety" and therefore she eventually enrolled him in a GED program. (Tr. 311.) As an adult, Plaintiff's "frustration and depression increased" and he was admitted to the Northwest Behavioral residential treatment facility for depression after he attempted to commit suicide. (Tr. 311.) After his suicide attempt, Susan F. "sought even more support" for Plaintiff and he "went to live in an assisted living facility for young adults," which "has provided him good caring structure, as they oversee his every day needs as well as monitor his medication, medical and therapist appointments." (Tr. 311.) Susan F. explained that Plaintiff has tried to hold a job, but Plaintiff's anxiety prevents him from doing so, noting that Plaintiff "flees because he is not equipped to handle stress." (Tr. 311.)

Yonathan Y., the manager of Plaintiff's adult foster care facility, wrote a letter on March 15, 2018, describing Plaintiff's impairments. (Tr. 304.) Yonathan Y. noted that Plaintiff moved into the care facility on March 10, 2016, and that he cares for and sees Plaintiff daily. (Tr. 304.) Yonathan Y. noted that Plaintiff has problems on a daily basis including "remembering things," needing direction, and requiring reminders with personal hygiene activities like "brushing his [teeth], grooming, [and] wearing appropriate cloth[es] for the weather." (Tr. 304.) Yonathan Y. also noted that foster home staff administer and record Plaintiff's medications because Plaintiff is unable to do so properly. (Tr. 304.) Finally, Yonathan Y. reported that Plaintiff "trusts anyone who talks to him" and does not realize he can be manipulated, and that Plaintiff's drug and alcohol exposure during birth affect his ability to think "straight and focus on one thing." (Tr. 304.)

The ALJ gave "little weight" to these lay witness opinions, because: (1) "[b]y virtue of their relationships with the claimant these witnesses cannot be considered disinterested third

party witnesses whose testimonies would not tend to be colored by affection for the claimant and

a natural tendency to agree with the symptoms and limitations the claimant alleges," and (2)

"significant weight cannot be given to their testimonies because they are not consistent with the

preponderance of the opinions and medical evidence in the case" where "the claimant reported

that he is able to care for his personal hygiene independently, prepare meals, perform household

chores, and utilize public transportation." (Tr. 26.)

Plaintiff argues that the ALJ's first reason for rejecting the lay witness testimony is "a

blanket rejection" that "cannot be deemed germane and specific to each witness," and "the fact

that these lay witnesses had personal relationships with the claimant is insufficient to discount

their testimony." (Pl.'s Opening Br. at 16.) The Court agrees. Courts have consistently held that

it is an improper for an ALJ to discredit a lay witness report based on the witness' relationship to

the claimant. *See, e.g., Smolen*, 80 F.3d at 1289 (holding that it is improper to discredit lay

witness testimony merely for the reason that it was provided by family members); *Mannina v.

Berryhill*, No. 2:17-CV-01850-AC, 2019 WL 446405, at *8 (E.D. Cal. Feb. 5, 2019) (finding

that the ALJ improperly discredited lay witness testimony from the claimant's mother because of

her potential bias as an interested party); *Johnson v. Astrue*, No. EDCV 07-01694-MLG, 2008

WL 4553141, at *6 (C.D. Cal. Oct. 9, 2008) (finding that it was improper for the ALJ to discount

testimony of a lay witness roommate because of potential bias). The ALJ erred by discrediting

the lay witness testimony because of the witnesses' relationships with Plaintiff.

Plaintiff also argues that the ALJ improperly discounted the lay witness statements based

on Plaintiff's activities of daily living. (Pl.'s Opening Br. 16.) As discussed above, the ALJ's

reliance on Plaintiff's reported activities was misplaced. For the same reasons, the ALJ erred in

discounting the lay witness opinions based on Plaintiff's reported activities. Thus, the ALJ failed to provide any germane reasons to discount the lay witness opinions.

## IV.    STEP TWO FINDINGS

Plaintiff argues that the ALJ erred at step two by not finding that his neurodevelopmental disorder associated with prenatal alcohol and drug exposure was a severe impairment. (Pl.'s Opening Br. at 12-13.)

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. To meet his burden of showing harmful error, Plaintiff must explain what limitations were erroneously omitted from his RFC due to the ALJ's alleged error at step two. *See, e.g.*, *Eriksen v. Colvin*, No. 15-159-PK, 2016 WL 3961712, at *4 (D. Or. July 22, 2016) (noting that any error at step two was harmless because the claimant failed to "point to any limitations erroneously omitted from the RFC" (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007))).

The ALJ noted that he "considered the history of drug and alcohol abuse, PTSD, and fetal ETOH syndrome as impairments," yet found "the record did not show any examination findings, which would support any functional limitations related to these impairments." (Tr. 17.) Accordingly, the ALJ found that these impairments were "not severe," although he noted that he "reviewed and considered all 'severe' and 'non-severe' impairments in formulating the following residual functional capacity[.]" (Tr. 17.)

Plaintiff argues that the ALJ's alleged error at step two was harmful because his neurodevelopmental disorder associated with prenatal alcohol and drug exposure "causes significant limitations" and "results in a substantial loss of ability to sustain basic work activities," noting that Dr. Boyd found Plaintiff's neurodevelopmental disorder caused "broad adaptive deficit one standard deviation below the cutoff for developmental disability eligibility."

(Pl.'s Opening Br. at 13.) Plaintiff cited record evidence that he has "impaired impulse control," "anger and difficulty controlling his temper," the "inability to complete multiple-part tasks," "impairment in concentration and attention," and "longstanding diagnoses of cognitive impairment and learning disability," all of which, if properly considered, would lead to a finding that Plaintiff is disabled. (Pl.'s Opening Br. at 13.)

As discussed above, the Court concludes that the ALJ failed properly to consider Plaintiff's symptom testimony, lay witness testimony, and medical opinion evidence, including evidence from Dr. Boyd who found limitations relating to Plaintiff's neurodevelopmental disorder associated with prenatal alcohol/drug exposure. In light of the ALJ's failure properly to evaluate Dr. Boyd's medical opinion regarding Plaintiff's neurodevelopmental disorder, the ALJ also failed to account for the limitations related to Plaintiff's neurodevelopmental disorder when formulating the RFC. Although the ALJ continued the sequential analysis beyond step two, the Court concludes that the ALJ erred by failing to include Plaintiff's neurodevelopmental disorder as a severe impairment and failing to incorporate in the RFC the limitations resulting therefrom.

## V.    STEP THREE FINDINGS

Plaintiff argues that the ALJ erred by failing to find that Plaintiff meets or equals listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma and stressor-related disorders), singly or in combination. (Pl.'s Opening Br. at 13-14.) Plaintiff argues that his impairments meet or equal listings 12.04, 12.06, 12.11, and 12.15, singly or in combination, based on the improperly rejected medical opinion of Plaintiff's mental health counselor, Duyn. (*See* Pl.'s Opening Br. at 14, arguing that Plaintiff is entitled to benefits because the ALJ erred in rejecting Duyn's opinion that Plaintiff has marked to extreme limitations in the paragraph B criteria.)

At step three, the ALJ determines if one or more of a claimant's severe impairments "meets or equals" one of the presumptively disabling impairments listed in the SSA regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). As discussed above, the ALJ did not properly evaluate medical opinions from Drs. Boyd and Bryant, and the opinion of a treating provider whose notes had an ineligible signature. By failing properly to evaluate these medical opinions, it is unclear whether the ALJ properly determined that one or more of Plaintiff's severe impairments meets or equals a listed impairment at step three. The ALJ will reevaluate step three on remand.

## VI.    STEP FIVE FINDINGS

Plaintiff argues that the ALJ erred at step five because the ALJ provided an incomplete hypothetical to the VE when determining whether Plaintiff could perform work in the national economy. (*See* Pl.'s Opening Br. at 19-20.) Because the Court concludes that the ALJ erred at steps two and three, and failed properly to credit Plaintiff's subjective symptom testimony, the lay witness testimony, and the medical opinion evidence, the ALJ necessarily also failed to fashion an RFC that accurately reflects Plaintiff's limitations. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value."). Therefore, the Commissioner did not meet his burden at step five to identify jobs existing in significant numbers in the national economy that Plaintiff could perform.

## VII.    REMEDY

### A.    Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). In a

number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison*, 759 F.3d at 1021 (citations omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citations omitted). Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

**B.    Analysis**

Plaintiff is unable to satisfy the credit-as-true standard because the record contains conflicts and ambiguities that the ALJ must resolve. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (stating that further proceedings are useful when "there is a need to resolve conflicts and ambiguities").

On remand, the ALJ will, among other things, reevaluate the medical opinion from the unidentified medical provider. That medical provider opined that Plaintiff would require extra breaks and would be absent from work three days per month. (*See* Tr. 1146-47.) The VE testified that if a claimant missed two or more days of work or was off task twenty percent or more of the time, he would not be able to maintain employment in the national economy. (*See* Tr. 80.)

In addition, the ALJ failed properly to evaluate Plaintiff's testimony, the lay witness testimony, and medical opinion evidence regarding Plaintiff's limitations. Neither the ALJ nor

Plaintiff's counsel posed specific questions to the VE that incorporated the limitations that Plaintiff, the lay witnesses, or the medical opinions identified. Thus, there is no evidentiary basis from which the Court can conclude on this record that the improperly rejected evidence compels a finding of disability. The Court concludes that further administrative proceedings would serve a useful purpose, and therefore exercises its discretion to remand this case for further proceedings.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

DATED this 27th day of July, 2020.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 29 – OPINION AND ORDER